# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NOBILIS HEALTH CORP*., et al.*,<br><br>    Debtors. | Chapter 7<br><br>Case No. 19-12264 (CTG)<br><br>Jointly Administered |
| ALFRED T. GIULIANO, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Nobilis Health Corp., *et al.*,<br><br>    Plaintiff,<br><br>        v.<br><br>HARRY J. FLEMING, *et al.*,<br><br>    Defendants. | Adv. Proc. No. 21-51183 (CTG)<br><br>**Related Docket Nos. 181, 201, 203, 207** |
| ALFRED T. GIULIANO, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Nobilis Health Corp., *et al.*,<br><br>    Plaintiff,<br><br>        v.<br><br>HARRY J. FLEMING, *et al.*,<br><br>    Defendants. | Adv. Proc. No. 23-50486 (CTG)<br><br>**Related <u>Docket No. 13</u>** |

## MEMORANDUM OPINION AND PROPOSED
## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Debtor Nobilis Health Corp. was once a publicly traded healthcare company

that (through its affiliates) owned and operated more than 30 surgical facilities and

clinics.  In 2017, the company found that insurers were declining to pay for certain procedures.  Taking the view that these delayed payments would ultimately be made, the company altered its accounting practice, keeping certain of these receivables on the company's books rather than writing them off when they had been outstanding for more than a year.  In the end, however, the insurers never paid for these procedures.  The company filed to liquidate under chapter 7 of the Bankruptcy Code in 2019.

The chapter 7 trustee brings this lawsuit against various of the company's former officers and directors, claiming that they breached their fiduciary duties.  The chief allegation in the complaint is that the defendants caused the debtors to change their practice of writing off receivables that had been outstanding for more than a year in order to deceive lenders into extending credit.  Because the company was unable to collect on those receivables, the unpaid receivables that remained on the company's balance sheet began to mount.  The debtors subsequently missed a securities filing deadline, were delisted from the stock exchange, and filed for bankruptcy under chapter 7.

Separately, the debtors' largest creditor sued some of the defendants for negligent misrepresentation, pointing to the same conduct that forms the basis for the trustee's lawsuit.  That case settled and, as a part of its resolution, the defendants received an assignment of the creditor's claim against the estate.  The trustee brought a separate adversary proceeding seeking to subordinate the defendants' claims on the

ground that those claims arose out of defendants' inequitable conduct, namely the same breach of fiduciary duty that is the subject of the initial adversary proceeding.

The defendants moved for summary judgment in the breach of fiduciary duty case. *First*, they argue that their actions were consistent with their fiduciary duties in view of the deference to which their business judgments are entitled under Delaware law. *Second*, they contend that there is no basis to conclude that any alleged breaches of fiduciary duty were causally related to the debtors' ultimate business failure. The defendants separately moved to dismiss the equitable subordination claim.

The summary judgment record supports the defendants' position with respect to the breach of fiduciary duty claims. Discovery failed to produce evidence that would permit a reasonable finder of fact to conclude that the defendants breached their fiduciary duties. To be sure, the evidence would be sufficient to permit a finding that the defendants participated in the company's decision to take an aggressive accounting position. But in light of the deferential standard imposed by the business judgment rule, that is insufficient to give rise to a claim of breach of fiduciary duty. And alternatively, even if there were a breach of duty, the evidence is insufficient to permit a reasonable finder of fact to conclude that such a breach was causally related to the debtors' failure.

The underlying problem was the fact that insurers were refusing to pay for procedures the debtors performed. No evidence in the summary judgment record, however, would permit a reasonable juror to conclude that it was the accounting

errors, rather than the underlying economic reality the debtors faced in view of the change in insurer behavior, that caused the business failure.

Indeed, at the end of the day, the trustee's case fails for the same reason this Court dismissed the trustee's claim for common law fraud. To the extent any fraud occurred here, the debtors (in whose shoes the trustee stands) were the perpetrator rather than the victim. While the trustee has standing to assert claims held by the debtors for the benefit of creditors, the trustee cannot assert claims for fraud that are held directly by either shareholders or creditors—and that run *against* the debtors. To be sure, there is a point at which a corporation's directors and officers, were they to choose to steer a company down a path of criminality, would breach their duties to act in the company's best interests. The conduct shown in the summary judgment record, however, falls far short of that line. That record, read in the light most favorable to the trustee, demonstrates that the debtors made improper accounting decisions with respect to its receivables. The trustee argues vigorously that these errors violated the company's or the individuals' obligations under the federal securities laws. Even if the trustee were correct about that (and it bears note that nothing in the record suggests that either the SEC or the company's shareholders ever asserted such a claim), that would still fall short of what one needs to demonstrate in order to establish a claim of breach of fiduciary duty.

The Court will thus enter summary judgment (or, where appropriate, recommend the entry of summary judgment) for the defendants in the adversary proceeding claiming breach of fiduciary duty. Finally, in light of the Court's

disposition of claims for breach of fiduciary duty, the Court will dismiss the adversary proceeding asserting a claim for equitable subordination.

### Factual and Procedural Background

Debtor Nobilis Health Corporation was a publicly traded healthcare company that (along with its affiliated debtor entities) owned 33 facilities in Texas and Arizona.[1]  The defendants are former officers and directors of the debtors.  Defendant Harry Fleming was the Chief Executive Officer from January 2016 to December 2018 and Chairman of the Board of Directors from November 16, 2017 until the debtors' bankruptcy filing.[2]  Defendant Kenneth Efird was the President for the relevant period;[3] defendant David Young was the Chief Financial Officer;[4] Brandon Moreno was  the Associate Vice President of Finance, and eventually, the Vice President of Finance;[5] Marcos Rodriguez was the Chief Accounting Officer;[6] and Steve Ozonian was a member of the Board of Directors and served on Nobilis Health Corp.'s Audit Committee.[7]

---

[1] D.I. 225-2 at 9 of 199 (Nobilis Health Corp. Dec. 31, 2017 10-K Form). Nobilis Health Corp. and its affiliates are referred to as "debtors.".  Unless otherwise indicated, citations to items on the Court's docket are to the docket in No. 21-51183, and are cited as "D.I. __.".  Materials on the docket of the main bankruptcy case, *In re Nobilis Health Corp., et al.*, No. 19-12264 (CTG) (Bankr. D. Del.) are cited as "Main Case D.I. __.".

[2] D.I. 184-49 at 8 of 24 (Plaintiff's Answer and Objection to Fleming's Interrogatories).

[3] D.I. 215 at 104 of 263 (Efird Dep.).

[4] *Id.* at 48-49 of 263. (Young Dep.).

[5] *Id.* at 174-175 of 263 (Moreno Dep.).

[6] *Id.* at 200 of 263 (Rodriguez Dep.).

[7] D.I. 80 ¶ 19 (Ozonian Answer to Compl.).  Ozonian suffered health issues, leading him to step down as Chair of the Audit Committee, but remained on the Board of Directors until 2019.  *See* D.I. 225-54 at 5 of 9 (Ozonian Dep.).

The debtors were primarily out-of-network healthcare providers.  As such, they did not have contracts with major health insurers but relied upon third-party reimbursement from private insurers to pay for the services rendered.[8]  Consistent with ordinary principles of accrual accounting, the debtors recognized revenue at the time the services were rendered.  The subject of this litigation is, first, how the debtors recognized revenue in the first instance, then how the debtors determined when those receivables needed to be written off as uncollectible.

Revenue was recognized initially through an estimation process. A revenue management team projected the amount Nobilis expected to receive on a procedure-by-procedure basis according to numerous factors.[9]  The company adjusted these estimates on an on-going basis.[10]  These revenue recognition decisions were subject to several layers of authority including the finance department, an auditor, and ultimately, management.[11]

Nobilis historically wrote off most accounts receivables that had been outstanding for more than a year.[12]  But notwithstanding the write off, the company continued to seek collection on those accounts.[13]  As discussed extensively below, in late 2017, management increased the proportion of the receivables that were more

---

[8] D.I. 225-2 at 58 of 199 (Nobilis Dec. 31, 2017 Form 10-K).

[9] *Id.* at 89-90 of 199 (Nobilis Dec. 31, 2017 Form 10-K).

[10] *Id.*

[11] D.I. 182 at 17 (chart summarizing testimony cited); D.I. 214 at 5-7 (explaining collectability analysis with record citations).

[12] D.I. 215 at 180-181 of 263 (Moreno Dep.).

[13] *Id.* at 22-23 of 263 (Moreno Dep.).

than a year old that it estimated it would collect in the future.  Unless and until these receivables were actually collected, the effect of this practice was to increase the receivables that remained on the company's books.[14]  This decision was preceded by a significant decline in cash collections on the company's receivables in the second quarter of 2017 with a larger projected shortfall in the third quarter.[15]  The defendants had several theories as to why aging receivables were accumulating, but repeatedly stated that they believed that these receivables were still collectable.[16]  In this same period, Hurricane Harvey made landfall in Houston, further disrupting the debtors' operations.[17]

The debtors applied the new revenue recognition formula through 2018.  Actual collections, however, were less robust.  As a result, the company reported mounting uncollected accounts receivable.[18]  The debtors then missed the filing deadline for their third quarter 10-Q in 2018 and requested additional time for the auditor to complete its review of the financial statements.[19]  At the auditor's request,

---

[14] *See infra* Part I-A-1.

[15] D.I. 225-25 at 3 of 30 (Aug. 16, 2017 Management Report); D.I. 184-42 at 4 of 4 (email from lender BBVA to Nobilis).

[16] Reasons included technological and vendor issues delaying collections; D.I. 215 at 28, 37 of 263 (Moreno Dep.); D.I. 215-1 at 8 of 18 (Feb. 23, 2018 memorandum); and issues with insurance reimbursing pre-authorized claims, *id.* at 8-11 of 18 (Feb. 23, 2018 memorandum); D.I. 215-5 at 39-41 of 70.  Nobilis' lender, BBVA, stated that the later increase in receivables more than one year old were due to changes in third party payor behavior.  *See* D.I. 215-6 at 32 of 107.

[17] D.I 215-5 at 41 of 70 (Feb. 1, 2019 memorandum).

[18] D.I. 215 at 118 of 263 (Wiggins Dep.); D.I. 225-90 at 25 of 71 (Dec. 31, 2017, $20.4 million; March 31, 2018, $26.2 million); D.I. 225-81 at 23 of 74 (June 30, 2018, $38.8 million).

[19] D.I. 225-68; D.I. 225-69.

the debtors retained additional professionals to assess the debtors' books.[20] Ultimately, Nobilis failed make another SEC filing and was delisted.[21]

On October 21, 2019, the debtors filed a voluntary chapter 7 petition and Alfred Giuliano was appointed the chapter 7 trustee.[22]  Two years later, the trustee initiated this adversary proceeding alleging that twelve defendants breached their fiduciary duties and committed corporate waste and common law fraud.[23]  The Court granted a motion to dismiss the claims for corporate waste and common law fraud as well as the claims against one of the 12 defendants.[24]  The parties thereafter stipulated to the dismissal of the breach of fiduciary duty claims against five more defendants.[25] Discovery has now been completed and the six remaining defendants bring the current motions for summary judgment.[26]

Concurrent with the summary judgment briefing, the trustee filed a second adversary proceeding against Fleming, Young, and Moreno for equitable subordination.  Those defendants had been sued directly by BBVA, the debtors' largest creditor, over the same events that are at issue in this lawsuit.  In September

---

[20] D.I. 225-104 (CFO Kenneth Klein email summarizing call with auditor).

[21] D.I. 225-70 (Nobilis Sept. 3, 2019 Form 8-K).

[22] Main Case D.I. 1.

[23] D.I. 1.

[24] D.I. 77.

[25] D.I. 129.

[26] D.I. 181 & 201 (Fleming), D.I. 203 (Ozonian), D.I. 207 (Young, Moreno, Efird, and Rodriguez).

2022, these defendants settled with BBVA.[27]  As part of that settlement, BBVA assigned its claims against the estate to the three defendants.  The trustee now seeks to subordinate those claims, alleging that because none of this would have arisen but for the defendants' actions that are alleged to breach their fiduciary duties.  The trustee therefore argues that the claim acquired from BBVA is subject to equitable subordination.[28]  The defendants moved to dismiss that adversary proceeding.[29]

### Jurisdiction

The district court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  The case has been referred to this Court pursuant to 28 U.S.C. § 157(a) and the district court's standing order of reference.[30]  Without consent, bankruptcy courts lack authority to enter final judgment on matters of private rights that are non-core matters.[31]  Claims for breaches of fiduciary duty are private rights, such that this Court would typically lack the authority to enter a final judgment on such a claim.[32]

---

[27] *Giuliano v. Fleming, et al.*, Adv. Proc. No. 23-50486 (CTG) (Bankr. D. Del. Aug. 21, 2023), D.I. 1 ¶ 4.  Citations to materials on the docket of this adversary proceeding are cited as "Adv. Proc. No. 23-50486, D.I. __.".

[28] *Id.* ¶¶ 124-134.

[29] Adv. Proc. No. 23-50486, D.I. 13.

[30] Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated Feb. 29, 2012.

[31] *Stern v. Marshall*, 564 U.S. 462, 488 (2011).

[32] *See, e.g.*, *In re Allied Systems Holdings, Inc.*, 524 B.R. 598, 606 (Bankr. D. Del. 2015); *Granfinanciera v. Nordberg*, 492 U.S. 33, 55 (1989).

The trustee's equitable subordination claim, however, changes this analysis, at least as it applies to Fleming, Young, and Moreno. That adversary proceeding relates to claims allowance and is thus a core proceeding on which this Court may enter final judgment. Moreover, by seeking to subordinate these defendants' claims against the estate on account of their alleged breaches of fiduciary duty, the trustee effectively put the question whether the defendants breached their fiduciary duties at issue in the claims allowance process. That operates to convert the breach of fiduciary duty claims into core matters on which the Court may enter final judgment.

The Supreme Court explained this principle in *Katchen v. Landy*. There, the Supreme Court held that § 502's predecessor, § 57g of the Bankruptcy Act, operated to transform an avoidance action into part of the claims allowance process for a preference defendant who had filed a proof of claim. Under § 57g, the claim of a creditor that had received an avoidable transfer would be disallowed unless and until the creditor had repaid the avoidable transfer back to the estate. In light of that principle, a creditor's proper share of the estate "can neither be determined nor allowed until the creditor disgorges the alleged voidance preference he has already received."[33] As a result of that principle, the question whether a creditor had received a preference necessarily became part of the claims allowance process. And because the claims allowance process was a "summary" proceeding (the kind of matter that could be heard and decided by the bankruptcy referee), the creditor's filing of a proof of claim operated to transform the avoidance action into a summary proceeding. The

---

[33] *Katchen v. Landy*, 382 U.S. 323, 336 (1966).

Supreme Court reaffirmed this understanding of the principle it had announced in *Katchen* in both *Granfinanciera* and *Stern*.[34]

The principle applies here. The subordination of the claims held by those defendants against whom the equitable subordination claim is asserted depends (at least on the trustee's theory) on whether they breached their fiduciary duties. As such, the breach of fiduciary duty claims against those defendants is thus part of the claims allowance process. For those defendants, the claim for breach of a fiduciary duty is therefore a core matter on which this Court may enter final judgment.[35] The claims for breach of fiduciary duty against the remaining defendants, however, remain non-core matters. For those defendants, the Court may make (and this Memorandum Opinion shall constitute) proposed findings and conclusions of law that are subject to *de novo* review by the district court.[36]

---

[34] *Granfinanciera*, 492 U.S. at 57-59; *Stern v. Marshall*, 564 U.S. 462, 496 (2011). *See also*, *In re Cyber Litigation*, No. 20-12702 (CTG), 2023 WL 6938144, at \*12 (Bankr. D. Del. Oct. 19, 2023).

[35] *Katchen*, 382 U.S. at 336. As to those defendants — Fleming, Young, and Moreno — this Memorandum Opinion sets forth the Court's findings of fact and conclusions of law as required by Rule 7052 of the Federal Rules of Bankruptcy Procedure (which incorporates Rule 52 of the Federal Rules of Civil Procedure).

[36] *See* 28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. 9033.

As this Court noted in *In re Cyber Litigation*, "in the context of a motion for summary judgment the issue of whether a bankruptcy court may enter a final judgment is a matter of relatively little consequence. Regardless of whether a bankruptcy court issues a 'judgment' or makes proposed findings and conclusions, a decision granting a motion for summary judgment is subject to the district court's *de novo* review in any event." *In re Cyber Litigation*, 2023 WL 6938144, at \*5 n.41; *see Executive Benefits v. Arkison*, 573 U.S. 25, 39 (2014).

### Analysis

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[37]   In reviewing the evidence, the Court makes all reasonable inferences in the light most favorable to the non-moving party.   A court considering a motion for summary judgment shall not make credibility determinations or weigh the evidence.[38]  Rather, the role of the court is to assess the record evidence and determine whether it would permit a reasonable finder of fact to rule in favor of the non-moving party.[39]  If so, the motion must be denied.   On the defendants' motions for summary judgment, then, the question is whether defendants have established that, based on the record before the Court, a reasonable finder of fact would be compelled to find in their favor.

In the trustee's lawsuit asserting claims of breach of fiduciary duty, the defendants are entitled to summary judgment because the summary judgment record would not permit a reasonable jury to conclude that defendants breached their duties (as set forth in Part I).   Alternatively, even if there were a basis for finding a breach of the duty, the evidence would not permit a finding that such breach was the cause of the debtors' failure (as set forth in Part II).

Finally, as discussed in Part III, the adversary proceeding seeking equitable subordination of claims asserted by Fleming, Young, and Moreno is dismissed (under

---

[37] Fed. R. Civ. P. 56 made applicable by Fed. R. Bankr. P. 7056.

[38] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[39] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).

the standards applicable to a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure) because it is premised on the unsuccessful breach of fiduciary duty action.

**I.     The motion for summary judgment will be granted/recommended for all defendants, as no reasonable jury could find the defendants liable for a breach of fiduciary duty.**

The trustee claims that certain directors and officers breached their fiduciary duties to the debtors.  The parties do not contest that the defendants owed the debtors fiduciary duties.  The only dispute is over whether the defendants breached those duties.

Officers and directors owe fiduciary duties to the corporation they serve under Delaware law.[40]  But the business judgment rule grants those directors and officers a great degree of flexibility by presuming that the directors and officers of a corporation act on an informed basis in good faith, and in the honest belief that the actions taken were in the best interests of the company.[41]  To rebut this presumption, a plaintiff must show the defendants breached their duties of care or loyalty, or acted in bad faith.[42]

The duty of care requires fiduciaries to act on an informed basis before making a business decision and to act prudently in carrying out their responsibilities.[43]

---

[40] *Gantler v. Stephens*, 965 A.2d 695, 708-709 (Del. 2009).

[41] *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 713 (Del. Ch. 2023).

[42] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370-371 (Del. 2006); *Gantler*, 965 A.2d at 708-09.

[43] *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985); *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 739 (Del. Ch. 2005).

Instead of analyzing the substance of the decision at issue, courts consider whether the process leading to the relevant decision reflected good faith consideration.[44]  To succeed, a plaintiff must show that the fiduciary was grossly negligent, requiring "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[45]  When the directors and officers act upon the material facts that were reasonably available to them at the time of alleged breach, courts do not inquire further into whether the defendants made the correct or best decision.[46]

The duty of loyalty requires fiduciaries to place the interests of the corporation above their own interests, to the extent their interests are not already aligned.[47]  To claim the duty of loyalty has been breached, the plaintiff must show that the defendants were conflicted and pursued their own interests above those of the company or that the defendant failed to pursue the best interests of the company in good faith.[48]

While the plaintiff claims the duty of loyalty was breached, there is no allegation that any defendant was conflicted.  Rather, the trustee claims the defendants breached their duty of loyalty by failing properly to oversee the company

---

[44] *Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

[45] *In re DSI Renal Holdings, LLC*, 574 B.R. 446, 470 (Bankr. D. Del. 2017).

[46] *Moran v. Household Intern., Inc.*, 490 A.2d 1059, 1075 (Del. Ch. 1985).

[47] *Walt Disney*, 907 A.2d at 751; *In re Orchard Enterprises, Inc. S'holder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014).

[48] *Orchard Enterprises*, 88 A.3d at 32-33; *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000).

14

in good faith. An officer or director may breach its duty of loyalty by either (1) "utterly fail[ing] to implement any reporting or information system or controls" or (2) "having implemented such a system or controls, consciously fail[ing] to monitor or oversee its operations, thus disabling [himself] from being informed of risks or problems requiring managerial attention."[49]   Corporate officers have oversight obligations under *Caremark* as they are "optimally positioned to identify red flags and either address them or report upward to more senior officers or to the board."[50]

To prevail on a *Caremark* theory, the plaintiff must show that the defendants observed and consciously disregarded "red flags" that would have put them on notice of a problem located within the scope of the defendant's corporate authority.[51]  This standard is exacting, the Chancery Court having described it as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[52]

The trustee contends that four sets of events give rise to claims for breach of fiduciary duty, either on account of the defendants' direct conduct or for their inactions under *Caremark*: (A) the changes to the company's revenue estimates in 2017, (B) the failure to disclose the change, (C) the failure of the revenue recognition

---

[49] *Stone*, 911 A.2d at 369-370 (citing *Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996)) ("The failure to act in good faith may result in liability because the requirement to act in good faith is a subsidiary element[,] i.e., a condition, of the fundamental duty of loyalty.") (internal quotations omitted).

[50] *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 362 (Del. Ch. 2023).

[51] *Caremark*, 698 A.2d at 967-968, 971.

[52] *Id*. at 967.

committee to prevent the accounting errors, and (D) the Audit Committee's decision to sign off on the company's financials.   As further described below, the claims relating to each of these events are asserted against different groups of defendants.

### A. No jury could find that the defendants breached their fiduciary duties by adjusting the revenue estimates in the third quarter of 2017, either by direct conduct or under *Caremark.*

The trustee claims that all six of the remaining defendants breached their fiduciary duties both by virtue of their direct affirmative conduct in connection with the company's change in accounting practices and by failing to take appropriate actions as required under *Caremark*.

The trustee alleges that the defendants breached their fiduciary duties through their actions or inactions related to the company's decision in late 2017 to change it practices regarding writing off receivables that were more than a year old. The trustee characterizes this as an attempt to "cook the books."[53]  The trustee points to the corporate officers' statements in internal emails expressing concerns about diminished third quarter estimated revenue in 2017, followed by an effort to boost those revenues to meet certain loan covenants.   The trustee alleges that the defendants ignored "red flags" that should have signaled to the defendants that they had obligations to act.

In 2015 and 2016, the debtors were growing, and the company was taking steps to digest the acquisitions of new facilities, which were driving its growth.   Nobilis

---

[53] D.I. 224 at 19, 21, 61.

identified "a long list of Material Weaknesses" in its financial reporting[54] and restated its 2014 annual financials.[55]  Nobilis engaged PricewaterhouseCoopers ("PwC") to assess its internal controls and to develop compliance procedures, as required by the Sarbanes-Oxley Act ("SOX").[56]  As an emerging growth company, the debtors were exempt from certain SOX requirements.[57]  But since this regulatory slack was temporary, Nobilis hired PwC to ensure it would be ready when it was required to comply fully.[58]  At the end of the PwC engagement, Nobilis incorporated PwC's findings in the company's SOX internal control documentation, which included a policy to write down to zero any receivable that was more than one year old.[59] Defendant Moreno sent the SOX internal controls document to all employees on December 5, 2016, indicating that it was "effective immediately."[60]

The parties dispute the effect of this policy.  The plaintiff argues that deviating from this policy after December 5, 2016 amounted to a misstatement of the debtors' financials that the debtors would be required to disclose as an accounting change in

---

[54] D.I. 225-8 (email from Rodriguez regarding SOX internal controls assessment and documentation).

[55] *Id.*; D.I. 184-42 at 2-4 of 4; D.I. 225-7 at 4 of 79.

[56] D.I. 184-46 at 2-3 of 106 (Rodriguez email "Management News Blast"); D.I. 225-8.

[57] *See* 15 U.S.C. § 7262(b) (exempting emerging growth companies from requirement that accounting firm attest to management assessment of internal controls).

[58] D.I. 184-15 at 13 of 34 (Fleming Dep.); D.I. 184-16 at 10-11 of 19 (Fleming Dep.) ("The status of the company at this time was an emerging growth company, which means we were not fully obligated to comply with every one of the Sarbanes-Oxley rules. And so, what we're seeing here with Marcos Rodriguez's email is the beginning stages of preparing the company for the full-on Sarbanes obligations in the future…").

[59] D.I. 225-12 (Rodriguez "Management News Blast" with new internal controls).

[60] *Id.* at 2 of 106.

its public filings.[61]  The plaintiff further contends that because of Moreno's email, all defendants were aware of the policy.[62]

The defendants argue that Nobilis' status as an emerging growth company exempted it from following these internal guidelines as it ramped up to full SOX compliance.   Rather than expressing current binding policies, the narratives expressed "goals."[63]  CEO Fleming's deposition testimony reflected this:

> I understand that as the chief accounting officer, [Rodriguez] was intent on building a program so that when we became SOX reporting, we'd be compliant… We didn't have full-on SOX obligation [because we were] an emerging growth company. That would be sometime in the future that we'd obtain that status and obligations.[64]

The defendants also refer to their explanation of the revenue recognition process in the debtors' public filings. Rather than a full write-off of all receivables that were more than a year old, Nobilis explained that the company's revenue cycle management team assessed accounts on a line-by-line basis:

> [I]n estimating net patient service revenues, management evaluates payor mix, (among private health insurance plans, workers' compensation insurers, government payor plans and patients), historical settlement and payment data for a given payor and type of medical procedure, and current economic conditions and revises its revenue estimates as necessary in subsequent periods.[65]

---

[61] D.I. 224 at 66 ("With respect to the 365+ AR Policy specifically, the Company followed it as standard practice *right up until* poor financial results in 2017 Q3 threatened to derail" a loan with BBVA for the purchase of a new facility).

[62] D.I. 224 at 65-66.

[63] D.I. 212 at 7.

[64] D.I. 184-15 at 13 of 34 (Fleming Dep.).

[65] D.I. 215-8 at 5-6 of 74 (Nobilis 2016 Form 10-K at 54-55). *See also* D.I. 215-6 at 77 of 107 (Nobilis 2015 Form 10-K at 43); D.I. 215-11 at 38-39 of 79 (Nobilis 2017 Form 10-K at 52-53).

The record shows that this analysis usually—but not always—resulted in receivables that were more thana year old being written down to zero.[66]  The financial statements from periods immediately before and after the SOX narrative implementation included some receivables over a year old that remained on the books.[67]  The defendants testified at their depositions that this was their understanding of the internal SOX controls policies and their reporting obligations.[68]

In the second quarter of 2017, the debtors' reported revenue was millions short of their projections and the company continued to face headwinds into the third quarter.[69]  In August 2017, executives expressed concern about even larger projected revenue shortfalls for the third quarter.[70]  Days later, on August 25, Hurricane Harvey made landfall in Houston, disrupting the debtors' operations.[71]

---

[66] D.I. 215 at 22-23 of 263 (Moreno Dep.).

[67] D.I. 215 at 58-60 of 263 (Young Dep.); D.I. 215-11 at 53 of 79 (Nobilis 2017 Form 10-K) (noting that the receivables that were more than a year old were $0.6 million for the year ending December 31, 2016); D.I. 215-6 at 28 of 107 (Nobilis aging report sent to BBVA in April 2017 reflecting over $2 million of receivables more than one year old at certain facilities).

[68] D.I. 184-7 at 22 of 31 (Rodriguez Dep.) ("Because as a collective group, management in consultation with their auditor, it was determined that we should add a statement related to accounts that were greater than 365 days since this number has grown. As you can see, it was also included in the 12-31-2016. So there was no change related to 365 from a policy standpoint. This is just an additional disclosure that was added. The policy still stands as is and was unchanged from '16 to '17.").

[69] D.I. 225-25 (Management Report as of August 16, 2017); D.I. 225-30 (Management Report as of September 21, 2017).

[70] D.I. 225-25 (Young email, Aug. 20, 2017); D.I. 225-28 at 3 of 4 ("I am out of ideas here. I can really use your help about what to do to figure out if we have an issue and how to turn this around. These numbers have been terrible for the past two weeks and we don't have good answers, much less a solution.") (Young email, Sept. 5, 2017).

[71] D.I. 215-5 at 41 of 70.

The record shows that in this time period, the debtors were both seeking to close on a new BBVA loan, the proceeds of which they would use to acquire another facility, and also at risk of tripping the covenants on their existing BBVA loan.[72] During the week of September 21, 2017, the debtors' budget estimates showed that the third quarter's shortfall would dwarf the second quarter's deficiency.[73]  Young expressed dismay at the estimates.[74]  In a September 28 email to Fleming, Young, and Efird, Moreno wrote:

> I want to dig in deep to [Days Sales Outstanding] at each facility and the individual agings to see what % of total AR is over 150-180-210 [days] etc.
>
> End of the day, lowest volumes all year and we were heading that way before any hurricane hit. Only difference this Q is collections weren't strong so we couldn't bank on as large of adjustments as last time.[75]

Young sent the group revenue estimates at 10:00 p.m. that evening and said he would continue to work with Moreno on them.  In an email to Patrick Yoder, the chief revenue officer, Young noted concerns regarding aging receivables:

> You will note that ½ of the receivables (~$5MM) are over 150 days old. Of this amount, $3.8MM is over 240 days or 8 months. As these amounts go over 360 days we will need to evaluate their collectability and make a decision on whether to drop them from our calculations. The first window of that is $893K. …We simply cannot afford for them to ignore $4MM that is 8 months old.[76]

---

[72] D.I. 225-53 at 5 of 6 (McCurdy Dep.).  *See also* D.I. 224 at 30.

[73] D.I. 225-30.

[74] *Id.* ("Do we believe these numbers? Looks bad.").

[75] D.I. 225-27 at 2 of 5.

[76] D.I. 225-44 at 3 of 4.

Five days later, Young held a meeting with Yoder to review third quarter revenues and project fourth quarter revenues.  He later sent to Fleming, Efird, and Moreno an estimate that projected $65 million in revenue for the third quarter of 2017.[77]

The next day, following a meeting to discuss the revenue projection, a Nobilis employee expressed skepticism.  His preliminary analysis suggested that they would "be lucky to get to just above $60 [million]."  He but acknowledged, however, that the numbers required further "scrubbing" and that there remained "work to do."[78]  Two days later, Moreno returned to the group with a revenue estimate of $64.8 million, just short of Young's projection.[79]  The increase in revenue came in part from enlarged estimates of aging receivables that would remain on the books.  It is uncontroverted that in third quarter of 2017, Nobilis changed its practice regarding the accounting treatment of aged receivables.[80]

In the subsequent weeks, the defendants were in contact with the debtors' auditor and discussed the change, including in an email on October 31 and a phone

---

[77] D.I. 225-39.

[78] D.I. 225-43.

[79] D.I. 225-45.

[80] D.I. 225-1 at 5-6 of 14 ("We had a general practice that we followed and we did not follow that practice in the third quarter. We changed that practice…. Prior practice was for a receivable that had gone over 365 days would be excluded from receivables… Now they were going to be included.").

21

call on November 2.[81]   Discussions continued into 2018 regarding the issue.   The record includes a draft memorandum from Moreno to the Accounting Files stating that the debtors historically "demonstrated ability to liquidate claims over the 365-day threshold."[82]  The auditor continued to question assumptions made in the revenue estimates, but eventually signed off on the company's public filings.[83]

The defendants sought to understand why their aging accounts receivable were going uncollected.  They developed theories, including that the delays were caused by slowdowns from their collections agent, the effects of Hurricane Harvey, and a change in reimbursement behavior from insurers.  The last theory, initially treated with skepticism by some internally, would later be validated by others.[84]  In addition to modifying their accounting policies to reflect these changes, the debtors made other adjustments such as building a patient-intake tool, consolidating billing and collection personnel to one location, and increasing the debtors' collection workforce.[85]

---

[81] D.I. 184-28 (email from auditors to Rodriguez dated October 31 regarding AR Aging); D.I. 184-29 (conference call information with Rodriguez, Young, Moreno, and auditors on November 2).

[82] D.I. 215-1 at 10 0f 18 (Feb. 23, 2018 memorandum).

[83] D.I. 225-47 at 32 of 33 (email from BBVA to Young and Moreno regarding discussion with auditors over accounting treatment of aged receivables); D.I. 215 at 144 of 263 (Edwards Dep.); D.I. 215-5 at 57 of 70 (review of revenue reasonableness dated 9/30/2017).

[84] D.I. 225-28; D.I. 225-76 (Young expressing view that insurance reimbursement theory did not "hold water").  BBVA stated that they believed the change in reimbursement behavior was widespread, as others were raising the same issue. D.I. 184-42 at 4 of 4.  BBVA indicated that it could not have foreseen the increase in difficulty of collecting out-of-network charges. D.I. 184-31 at 9-11 of 18.

[85] D.I. 184-48 at 7 of 11 (auditor AFDA and lookback analysis).

This record would not permit a finding that the defendants were grossly negligent in how they evaluated the company's position in October 2017 and reacted to the circumstances they faced.  The plaintiff alleged that executives artificially inflated their revenues to avoid tripping a covenant under the BBVA loan.  Plaintiff contends that in doing so, defendants broke with the company's accounting practices and SOX internal controls and never made any disclosure of those changes.  Plaintiff argues that the revenue projection that Young sent prior to the October 4 meeting was simply reverse engineered by the finance department led by Moreno.[86]  Without this, plaintiff suggests, BBVA may not have agreed to the second loan that the company sought.[87]

The plaintiff claimed the record shows that Moreno and Young instigated the scheme and manipulated the debtors' accounts receivable to inflate their revenues. The trustee alleged that Efird was instrumental in this process while Fleming knew of it and condoned it.[88]  Rather than engaging in a rigorous analysis, according to the trustee, the defendants circumvented their ordinary revenue recognition process and implemented the accounting change without meaningful contemporaneous analysis.[89] In doing so, the group intended to misrepresent the company's financial position and breached their fiduciary duties to the debtor company.

---

[86] D.I. 224 at 24-50, 29-30.

[87] D.I. 225-51 at 3-5 of 5.

[88] D.I. 224 at 52.

[89] *Id.* at 54-55.

The defendants argue that the record shows a different story. Language in emails suggest that they engaged in a rigorous analysis: Moreno wrote he was going to "dig in deep to [Days Sales Outstanding]" then, over a week later, he still had "work to do."  Rather than indicating the defendants were effectively reverse engineering their revenues to achieve a desired result, they sought to use data and re-evaluate the company's performance after a disruption to the business environment.  The defendants also argued that the company's auditors were informed of the changes in fall 2017 and signed off on the changes in 2018.

The plaintiff finally claimed that the defendants applied a blanket 25 percent discount rate for all receivables more than a year old, meaning they assumed that the debtors would collect 75 percent of such accounts receivable.  The plaintiff pointed to emails between the auditor and the defendants expressing concern and a need to re-evaluate this assumption on the ground that it lacked historical support.[90]  The e-mail in question, however, did not recommend that the company write down those receivables to zero.  Rather, it stated that the company's historical data was of limited utility in light of the substantial changes the company had undergone.[91]  The defendants showed that the debtors conducted a detailed analysis that considered the claim, procedure type, and which facility from which it originated in determining what fraction of the receivable should be treated as collectible.[92]  The auditor

---

[90] D.I. 225-48 at 2 of 5 (March 3, 2018 email from auditor to Moreno, Rodriguez, and Young).

[91] *Id*.

[92] D.I. 215-11 at 38-39 of 79 (Nobilis 2017 Form 10-K at 52-53).

referenced changes in specific facilities to understand the aging trends across the company's business.[93]

### 1. The defendants' conduct regarding the change in revenue estimation policy in the third quarter of 2017 did not breach their fiduciary duties.

The plaintiff argued that Fleming, Young, Moreno, and Efird decided to misstate the company's financials by violating its policy of writing off receivables that were more than a year old.  Such policies were reflected in the company's internal controls, which Rodriguez helped implement and develop. The trustee argues that compliance with the policies set forth in those internal controls violated federal securities laws.

The defendants, on the other hand, argue that because Nobilis was an emerging growth company, it was not required to adhere to policies set forth in internal controls documentation, as would otherwise be required under SOX.  As such, they contend that there was no hard and fast policy of writing down accounts receivable that were more than a year old.  Rather, they argue that their practice was to make appropriate adjustments on an on-going basis based on their assessment of what they would be able to collect.

This case, of course, is one for breach of fiduciary duty.  There is no suggestion that a bankruptcy trustee (standing in the shoes of the debtor) can sue a company's officers for the *company's* alleged violations of the securities laws.  The Court made a similar point, at the motion to dismiss stage, where it dismissed the claim for common

---

[93] D.I. 225-48 at 2-3 of 5.

25

law fraud on the ground that, on the trustee's theory, the debtors were the perpetrator rather than the victim of the alleged fraud.[94]  The Court accordingly need not decide whether SOX required the company was required to write down its receivables that were more than one year old.  Because the relevant claim is for breach of fiduciary duty, the question is whether the actions by the defendants deviated so far from ordinary business judgment to amount to bad faith and thus violate their fiduciary duties.

On that issue, the Court concludes that the most that the summary judgment record would support would be a finding that the defendants participated in a decision by the company to take an accounting position that was later called into question by outside professionals.[95]  Delaware law is clear, however, that it takes more than an erroneous exercise of business judgment to give rise to a claim of breach of fiduciary duty.  In light of the high bar set by applicable law, the record before the Court would not permit a finding that defendants' conduct was so grossly negligent that it could amount to a breach of their fiduciary duties.

This record would not permit a reasonable factfinder to conclude that that the defendants were grossly negligent in their assessment of the company's position in October 2017.  While the Court of Chancery found in *Lipman* that a complaint involving the misstatement of a partnership's financials stated a claim for breach of fiduciary duty, in that case the allegation was that the fiduciaries misstated the

---

[94] *In re Nobilis Health Corp.*, Adv. Proc. No. 21-51183 (CTG), <u>2022 Bankr. LEXIS 2057 at *24</u> & *24 n.65 (Bankr. D. Del. July 27, 2022).

[95] D.I. 225-107 at 8 of 19.

partnership's financials to cover up their own self-dealing.[96]  In other cases, plaintiffs' claims regarding financial misstatements survived, but the plaintiffs were shareholders asserting fiduciary duties owed to *them* rather than to the corporation, and the allegations were that the fiduciaries did not communicate truthfully with them.[97]  The reasoning of those cases is inapplicable here, where there is no suggestion of self-dealing and the plaintiff stands in the shoes of the entity that made the allegedly incorrect statements, rather than the party to whom the statements were made.

On the trustee's telling, the defendants made an overt decision, in the face of declining revenues, to doctor their financials by showing as revenue amounts that they had previously recognized would be uncollectible.  The Court concluded that such allegations survived the defendants' motion to dismiss, as a decision by a fiduciary to set the corporation off on a course of committing fraud would certainly be inconsistent with the duty to act in the corporation's best interests.[98]  The summary judgment record, however, does not bear out the trustee's theory.  What it shows instead is a lively discussion among the defendants, the lenders, and the auditors about the fact that revenues were falling short of projections at a time when there were many

---

[96] *Lipman v. GPB Capital Holdings LLC,* No. 2020-0054, 2020 WL 6778781 at **3-4, *11 (Del. Ch. 2020).

[97] *See, e.g., Anglo Am. Sec. Fund., L.P. v. S.R. Global Intern. Fund, L.P.,* 829 A. 2d 143, 157 (Del. Ch. 2003) (citing *Malone v. Brincat,* 722 A.2d 5, 10-11 (Del. 1998)).

[98] *Nobilis*, 2022 Bankr. LEXIS 2057 at *14, *18.  *See, e.g., In re American Intern. Grp., Inc.,* 965 A.2d 763, 795 (Del. Ch. 2009) (detailing officers involved with schemes to engage in sophisticated financial fraud, involving reporting increases in loss reserves and income).

different parts moving at the same time. The company was integrating new facilities, dealing with the results of a severe storm, and insurer payments had slowed. Was that the result (as the defendants asserted, and their revised accounting practices reflected) a matter of timing, such that the debtors would be paid for most of the procedures in question, only more slowly? Or would the insurers refuse to pay at all? Beyond the trustee's conjecture, there is literally nothing in the summary judgment record that would support the conclusion that the defendants knew that their revised projections were wrong and their financial statements therefore inaccurate.

Rather, based on the summary judgment record now before the Court, the following points are not subject to genuine dispute:

*First*, the defendants continued to account for some receivables that were more than a year old even after the implementation of the new SOX narratives. The SOX business narratives were made "effective" on December 5, 2016, but in financial statements and aging reports, the debtors consistently reported some receivables of more than a year old, including over $2 million in April 2017.[99] The aging receivables were never written down fully to zero, even after the SOX narratives' implementation date. Accordingly, the trustee's suggestion that defendants were violating a "known duty" in the fall of 2017 when they increased the portion of aged receivables that remained on their books necessarily fails.[100]

---

[99] D.I. 215-11 at 53 of 79 (Nobilis 2017 Form 10-K) (noting that receivables more than one year old was $0.6 million for the year ending December 31, 2016); D.I. 215-6 at 28 of 107 (Nobilis aging report sent to BBVA in April 2017 reflecting over $2 million of receivables more than a year old at certain facilities).

[100] D.I. 184-15 at 13 of 34 (Fleming Dep.).

*Second*, the defendants engaged a process to assess the changed circumstances in the third quarter of 2017 to estimate their revenues.  From early September 2017, the defendants sought answers for why their numbers were "terrible."[101]   The defendants deliberated internally regarding the cause of the financial difficulties.[102] Regardless of which cause was correct, the unmistakable fact is that the answer was unknown at the time.  Defendants spent weeks seeking to understand what occurred and assessing their accounts receivable.  They then took action that reflected their apparent understanding of how these changes would affect the company's finances.

*Third*, the company's auditor knew of the changes and later did not object to them.  The plaintiff claimed that the defendants could not rely upon any expertise of the auditors in displaying their good faith for the changes in the estimates for the third quarter of 2017 because they did not inform the auditors until February 2018.[103] But the summary judgment record shows phone calls and emails with the auditors— contemporaneous to the fall of 2017 and later emails referring to those conversations.[104]  A reasonable finder of fact could not conclude, from this record, that the defendants had engaged in a deliberate scheme to deceive their auditors.

---

[101] D.I. 225-28 (Young email, Sept. 5, 2017).

[102] D.I. 225-44 (collections agency); D.I. 184-13 at 28-20 of 39 (Hurricane Harvey); D.I. 184-31 at 9-10 of 18 (industry-wide trends).   The industry wide trends were particularly unforeseeable. *Id.* at 10-11 of 18.

[103] D.I. 224 at 58.

[104] *See, e.g.,* D.I. 225-19 at 2 of 4 (email from Young to Rodriguez and Moreno); D.I. 184-28 (email from auditors to Rodriguez dated October 31 regarding AR Aging); D.I. 184-29 (conference call information with Rodriguez, Young, Moreno, and auditors on November 2); D.I. 214 at 11.

With the benefit of hindsight, of course, one can now say that the defendants'
judgment proved to be incorrect.  But it is well established that this falls far short of
what is needed to establish a breach of fiduciary duty.[105]  Success on a breach of
fiduciary duty claim under Delaware law requires a substantial showing.  There must
be evidence of bad faith or that the defendants acted without having exercised any
semblance of business judgment.  The record here does not support that conclusion
for the change in the revenue estimates in the third quarter of 2017.

*Separately,* the plaintiff claims that Rodriguez, whose title was Chief
Accounting Officer, is liable on account of his actions.[106]  Unlike defendants Fleming,
Young, Moreno, and Efird, there is no evidence that links Rodriguez to the decision
to change the revenue estimates in 2017.  Rather, the plaintiff's evidence showed that
Rodriguez sought approval of the SOX business narratives from the Audit
Committee.[107]  He then sent an email about the goals of hiring PwC and the SOX
compliance procedures to other defendants in a "Management News Blast."[108]
Rodriguez later acknowledged that there had been a change in the third quarter of
2017,[109] and signed a statement to the auditor that he and other defendants were
"responsible for the fair presentation of the [] financial statements in conformity with

---

[105] *See*, *Walt Disney*, <u>906 A.2d at 37</u>.

[106] D.I. 224 at 64.

[107] D.I. 225-10 (Rodriguez email to Ozonian).

[108] D.I. 225-12 (Rodriguez "Management News Blast" with new internal controls).

[109] Rodriguez disputed that it was a "policy" change but rather an estimation change. D.I.
225-65 at 4-5 of 5 (Rodriguez Dep.).

[GAAP]" following the fall 2017 financial statements.[110]  Rodriguez was later involved in estimating the effects of Hurricane Harvey on the debtors' operations and meeting with the Audit Committee.[111]  Importantly, no evidence in the record suggests (and the plaintiff does not even allege) that Rodriguez had personal involvement in the decision to change the way revenue would be estimated in the third quarter of 2017, or even that Rodriguez knew those conversations were occurring.

As described above, to make a claim of breach of fiduciary duty based on a defendant's own conduct, the trustee must show that Rodriguez acted with gross negligence.  The only direct action at issue was Rodriguez's decision to sign a statement affirming that the financial statements were in compliance with GAAP after acknowledging the change in revenue recognition policy.  For the reasons set forth above, this cannot be enough.

As with the other defendants, the question is not whether the judgments Rodriguez reached with respect to how to meet the company's disclosure obligations ultimately proved to be correct.  Because nothing in the record would support the conclusion that his actions were unreasonable or made in bad faith, he is entitled to summary judgment on this count.

---

[110] While Rodriguez voiced displeasure with the auditor in internal emails, such dialogue does not bear on the issues before the Court today.  They do not relate to the auditor's work regarding the policy to write off receivables after one year or the financial statements at issue in this proceeding.

[111] D.I. 225-116 (internal report); D.I. 225-97 (Audit Committee minutes showing Rodriguez's attendance).

### 2. The defendants are entitled to summary judgment regarding supervisory liability under *Caremark* as it relates to the change in revenue estimation policies.

For a *Caremark* claim to succeed, there must be sufficient "red flags" as to signal to directors and officers that they have an obligation to act. Caselaw sets a high bar for a plaintiff seeking to establish such a claim. In *Stewart*, the plaintiff's allegations survived a motion to dismiss after the plaintiff alleged the director "approved the audited financial statements with little or no substantive discussion, despite warnings that significant irregularities occurred and the companies' procedures needed to be changed."[112] The director received a letter in which the auditor expressed significant difficulties in preparing financial statements, including extraordinary balance discrepancies. Further, multiple employees of the company allegedly informed the director of concerns—which included violations of internal policies and common-sense business practices.[113] In spite of all of that, there was not a claim under *Caremark*.

The trustee here claims there were red flags: the material weaknesses that led to the 2014 financial restatements,[114] and the increase in days sales outstanding and aging receivables.[115] The difficulty with the trustee's theory is that beyond his claim that the debtors' accounting was improper, he does not explain the underlying

---

[112] *Stewart v. Wilmington Trust SP Servs., Inc.*, 112 A.3d 271, 300 (Del. Ch. 2015).

[113] *Id.* at 300-301.

[114] D.I. 224 at 65-66.

[115] *Id.* at 66-68.

systemic deficiencies to which the defendants should have been alerted by virtue of these "red flags."

As to the claim that the red flags should have alerted the defendants to the failures of the debtors' accounting systems, the *Caremark* claim has the same problems as the "good faith" claim addressed above.  The summary judgment record makes clear that the defendants acted within the range of discretion afforded to them under the business judgment rule with respect to how the company addressed the fact that, in the fall of 2017, cash collections were declining, and old accounts receivable remained on the books.  To the extent the actual decisions were consistent with the defendants' fiduciary duties, it adds nothing to say that other defendants were on notice of the issue and should have taken some different action.

Insofar as the trustee is arguing that the "red flags" should have alerted the defendants to other concerns in the debtors' financial controls, the record makes clear that the company responded to that concern by engaging a reputable accounting firm.[116]  Insofar as the allegation is that more should have been done to seek to collect the aging accounts receivable, the record is undisputed that the company re-evaluated its business and policies to get to the bottom of the problem.[117]

Where the trustee is arguing that the red flags were within Rodriguez's supervisory purview and he disregarded those signs, the record does not support that he had such supervisory authority or failed to implement a system of control or

---

[116] D.I. 184-46 at 2 of 106 (Rodriguez email "Management News Blast"); D.I. 225-8.

[117] D.I. 184-42 at 4 of 4; D.I. 184-31 at 9-11 of 18; *supra* Part I-A.

consciously disregarded such flags.[118]  Rodriguez announced the new business narratives and was in communication with the Audit Committee regarding PwC's SOX compliance work.  Nothing, however, outside of his title of Chief Accounting Officer, indicates that he had any further role.  Like the argument with respect to the other defendants, this claim depends on the assertion that Rodriguez's fiduciary duties required him to ensure compliance with the accounting policies set forth in the SOX narratives.

At the end of the day, the Court is persuaded that the defendants are correct that the trustee's theory of wrongdoing—the defendants "cooked the books" to disguise the mounting financial problems—simply fails to line up with the *Caremark* legal theory the trustee advances.  The *Caremark* claim is designed to impose liability when a fiduciary fails to employ a rational process to advance the interests of the company.[119]  The record before the Court on summary judgment would not permit a reasonable factfinder to impose liability on that basis.

### B. The record would not support a finding that the defendants breached their fiduciary duties by failing to disclose the change in the revenue estimation formula.

Securities and Exchange Commission regulations require publicly traded companies to disclose any material accounting change, the date of the change, and the reason for such change.[120]  The trustee argues that defendants Fleming, Young,

---

[118] D.I. 224 at 64.

[119] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 122 (Del. Ch. 2009) (citing *Caremark*, 698 A.2d at 967-968).

[120] Item 303 of Regulation S-K; D.I. 225-85 at 46-47 of 88 (Devor expert report).

Moreno, and Efird breached their fiduciary duties by participating in issuing statements saying that the company had not made material changes to its accounting policies despite changing its revenue estimation model to include some accounts receivable that were more than a year old.[121]   The trustee similarly argues that Rodriguez, as the Chief Accounting Officer, should be liable for failing to ensure the disclosure.

The argument runs into the same trouble as the trustee's principal argument about the company's alleged improper accounting decisions.  The trustee stands in the shoes of the debtors, not its shareholders or the SEC.  So while there surely is a point at which a the company's officers or directors breach their fiduciary duties to the company by flouting applicable law, that is different from authorizing the trustee to act as private attorney general with the authority to enforce every alleged violation, by the company, of any and every regulation or standard.  Under the business judgment rule, so long as there was a reasoned basis for the officers' decision, they will not have violated their fiduciary duties.

The record in this case makes plain that the defendants had a reasoned basis for their decisions in this regard.  The record is clear that the issue was discussed with the company's outside auditors.[122]   In its prior public filings, the company had

---

[121] D.I. 225-57 at 8 of 8 (Nobilis Sept. 30, 2017 Form 10-Q).

[122] *See, e.g.,* D.I. 215 at 87 of 263 (Rodriguez Dep.) ("We discussed this with our auditors, and we collectively, as a group, both management and the auditors, decided what disclosures to include in our Qs and Ks."); D.I. 225-19 at 2 of 4 (email from Young to Rodriguez and Moreno) ("I distinctly [remember] having a conversation with [auditor] about [not disclosing the policy change]. Which also drove the call we had with them to review overall AR at the end of the quarter. I have the agenda from that meeting in my files.").

never disclosed a policy of writing down all receivables that were more than a year old to zero.  Rather, the company merely stated that its revenues were subject to continued evaluation based on several factors.  Since this was still true, there was certainly a basis for the judgment that there was no obligation to disclose a "change" in accounting practices.[123]   Indeed, the auditor reached precisely the same judgment.[124]  The company did, however, disclose the growth of its aging receivables in Note 6 of the 2017 Form 10-K.[125]  Based on this record, a reasonable finder of fact could not conclude that the defendants so departed from established standards in making this decision that they could be found to have breached their fiduciary duties.

The same is true of the trustee's allegation that, as a result of the accounting policy change, certifications filed by Young and Fleming were false.[126]  The Court of Chancery explained in *China Automotive Systems* that a claim of breach of fiduciary duty based on the filing of an incorrect certification would need to include a showing that the defendant *knew* that the certification was false.  Nothing in the summary judgment record would permit such a finding.[127]  Similarly, in *Citigroup,* the Court of Chancery emphasized that "to establish a threat of director liability based on a

---

[123] D.I. 215-5 at 33-34 of 70 (email from Young to Rodriguez and Moreno); D.I. 215 at 54-55 of 263 (Young Dep.); D.I. 215 at 87-91 of 263 (Rodriguez Dep.).

[124] D.I. 215-5 at 66-68 of 70 (auditor's notes of Q3 Audit Committee Meeting); D.I. 215 at 231-233 of 263 (Edwards Dep.).

[125] D.I. 225-2 at 111 of 159; D.I. 184-7 at 22 of 31 (Rodriguez Dep.).

[126] D.I. 224 at 52-54.

[127] *In re China Automotive Sys. Inc. Derivative Litig.*, No. 7145, 2013 WL 4672059, at *8 (Del. Ch. Aug. 30, 2013).

disclosure violation, plaintiffs must plead facts that show that the violation was made knowingly or in bad faith, a showing that requires allegations regarding what the directors knew and when."[128]

While Young and Fleming signed the financial statements and Rodriguez had a role implementing the business narratives, there is nothing in the record that could support a finding that any defendant acted in bad faith or believed at the time that the certifications were false.  Defendants are thus entitled to summary judgment on this point.

The trustee claimed the failure to disclose the changed revenue recognition policy amounted to a red flag, creating liability under *Caremark*.[129] As discussed previously, the bar here is higher.  There is no evidence that the defendants failed to create reporting systems or consciously disregarded their obligations as supervisors. They are similarly not liable under a *Caremark* theory.

### C. No jury could find the defendants breached their fiduciary duties as they relate to the debtors' internal revenue recognition committee.

The debtors' CEO, Fleming, formed an internal committee to address revenue recognition issues.  The trustee alleges that defendants Efird, Moreno, and Young breached their fiduciary duties in connection with the work of the revenue recognition committee because the committee failed to implement any policies.  The trustee further contends that Fleming should be subject to liability under *Caremark* for the

---

[128] *Citigroup*, <u>964 A.2d at 133-134</u>.

[129] D.I. 224 at 64.

Committee's inaction.[130]  The Court finds that neither theory subjects a defendant to liability.

CEO Fleming formed the revenue recognition committee on February 28, 2017, with an email to Efird, Young, Moreno, and three others.

> Team, I am forming a Revenue Recognition Committee effective immediately. Each of you will participate and you will collectively decide how you will operate and interface with management and Crowe (or any other auditor). For some time now I've been considering how we manage this extremely important function for the company. I have been seriously concerned that we have been putting this function on one person's shoulders. This new committee will report to the CFO [David Young]. You will adopt your own rules and procedures as well as pick a chair person to run the meetings. This new committee will set the company's future policies on revenue recognition and will make all decisions as a group. The CEO will not participate in this process. The CFO's participation will be up to the CFO. [Non-defendant member] will set the first meeting for tomorrow morning. I will expect the newly elected chairman to report to me on the committee's progress. Each of you has been chosen as initial members because of your background and skill set. I'd like to see the process take shape asap.[131]

Efird was elected chair of the committee at the first meeting on March 1, 2017.  The committee kept minutes for seven additional meetings through July 2017.[132]  No member of the committee identified a clear deliverable or policy change that emerged from the work of the committee.  While the committee was a part of the company's 2017 strategic plan, Efird testified at deposition that he did not consider it vital to the company.[133]

---

[130] D.I. 224 at 68.

[131] D.I. 225-20 (email from Fleming to Efird, Moreno, Young and others).

[132] D.I. 225-21 (email with meeting minutes attached).

[133] D.I. 224 at 15-18, 69; D.I. 225-22 at 7 of 8 (Efird Dep.).

The trustee alleges that the defendants who were members of the revenue recognition committee breached their duties of care to the company on account of the committee's inaction and failure to maintain the internal SOX controls.  In forming the committee, Fleming tasked the group to "set the company's future policies" indicating that there should be deliverables.  The committee only took minutes for a few meetings and never produced any policy changes.[134]  In depositions, members of the committee could not identify who chaired the committee or what was discussed at the meetings.[135]  The trustee argues that this shows that defendants abdicated their duties and violated their duties of care.[136]

The defendants assert that the committee's purpose was primarily to encourage collaboration and discussion across Nobilis' divisions.[137]  Fleming wrote that he was "seriously concerned that we have been putting this function on one person's shoulders."[138]

The defendants point to *Citigroup*, arguing that the committee members' liability should not be measured against internal documents, like Fleming's email that formed the revenue recognition committee.[139]  In *Citigroup*, a committee's charter charged members with reviewing and ensuring the accuracy of Citigroup's

---

[134] D.I. 225-21 (email with meeting minutes attached); D.I. 225-22 at 3-4 of 8 (Efird Dep.).

[135] D.I. 225-1 at 9-10, 11 of 14(Young Dep.); D.I. 225-14 at 7 of 14 (Moreno Dep.).

[136] D.I. 224 at 70-72.

[137] D.I. 214 at 36-37.

[138] D.I. 225-20 (email from Fleming to Efird, Moreno, Young and others).

[139] *Citigroup*, 964 A.2d at 135.

39

financial statements. The Court of Chancery ruled that "director liability is not measured by the aspirational standard established by the internal documents detailing a company's oversight system."[140]  Delaware law requires that actions were taken knowingly or in bad faith to create liability for a breach of fiduciary duty.

The plaintiff attempts to distinguish this case from *Citigroup* by arguing that the members "were specifically tasked by the CEO with setting the company's future policies on revenue recognition as part of the [revenue recognition committee] but failed to do so."[141]  Despite his insistence that this is not creating liability based on the text of an internal document, failing fully to comply with a direction set forth in an email cannot be a basis for a bad faith finding under the principles set forth in *Citigroup*, even if the email was sent by the CEO.  Failing to fulfill the request of a superior does not indicate that the inferior breached their duties of care and loyalty, particularly in a context in which the CEO's directive sets forth the type of "aspirational standard" that the Chancery Court found in *Citigroup* cannot establish a floor for the imposition of liability.

The plaintiff claimed that Fleming failed adequately to supervise the revenue recognition committee after its creation and should thus be liable for that failure under *Caremark*.  Fleming never discussed the committee's tasks with its chair (Efird), nor was he updated regarding the committee's progress.  The trustee says that when Fleming created the committee, Fleming found the issue of revenue

---

[140] *Id.*

[141] D.I. 224 at 71.

recognition "seriously concern[ing]" which the trustee alleges was a "red flag."   In return, Fleming argues that a *Caremark* claim does not turn on whether a subordinate follows directions, but whether the officer failed to monitor or oversee systems of control to a degree that disabled him from being informed of risks and problems.[142]

To establish liability under *Caremark*, the trustee would be required to show that Fleming had such conscious disregard for an obligation that is so glaring as to constitute bad faith.[143]   The plaintiff cited to the email forming the committee and Fleming's deposition where he maintained that he did not know whether the revenue recognition committee set policies and never discussed the work of the committee with its chair or followed up with respect to the committee's progress.[144]

If there were a red flag that Fleming observed regarding revenue recognition, he acted upon it by creating the revenue recognition committee.   And that committee was not the only entity with responsibility for addressing the issue.   The company also had an Audit Committee and an outside auditor that were concerned with revenue recognition.   *Caremark* requires that fiduciaries take appropriate steps to establish appropriate procedures.   It does not require them to micromanage.   As the Delaware Supreme Court explained the point in *Lyondell*, there is a difference "between an inadequate or flawed effort to carry out fiduciary duties and a conscious

---

[142] D.I. 227 at 9.

[143] *See Lyondell Chem. Co. v. Ryan*, <u>970 A.2d 235, 243</u> (Del. 2009); *In re McDonald's Corp.*, <u>289 A.3d at 370</u>; *Morris*, <u>246 A.3d at 133</u> n.57.

[144] D.I. 224 at 69.

41

disregard for those duties."[145]   Nothing in this record would permit a reasonable factfinder to conclude that Fleming consciously disregarded his obligations.

### D.   Summary judgment will be granted in favor of Ozonian, as no jury could find that he breached his fiduciary duty to the company in connection with the work of the Audit Committee.

Defendant Ozonian was the chair of the debtors' Audit Committee and sat on the board of the directors.  The plaintiff alleged that the Audit Committee sanctioned and helped implement the PwC-created SOX procedures.  The trustee alleged that, afterwards, the committee failed to ensure that receivables that were more than a year old were written down to zero or make a good faith effort to monitor the company's financials and controls.[146]   As the chair of the Audit Committee, the plaintiff claimed Ozonian had the authority to oversee the company's financials but that he failed to act after being put on notice of clear irregularities.[147]   No evidence was presented that Ozonian had any involvement in the decision to change the revenue recognition policy.[148]   Rather, the plaintiff alleged that the growth in receivables was a red flag that required Ozonian to act.[149]

The Audit Committee's role within Nobilis was to assist the Board of Directors with oversight of the integrity of financial reporting, compliance with regulatory requirements, and monitoring the performance of the independent auditor.  The

---

[145] *Lyondell*, 970 A.2d at 243.

[146] D.I. 224 at 73.

[147] *Id.* at 72.

[148] D.I. 224 at 39-40.

[149] *Id.*

committee was not, however, tasked with ensuring the accuracy of the financial statements.[150]   After the 2014 financial statements were restated, the Audit Committee helped "put in place" PwC to create the internal controls, which included the policy to write down to zero receivables that were more than a year old.  The Audit Committee approved that policy.[151]

While Chair, Ozonian actively participated in Audit Committee meetings.[152] The Audit Committee was at least aware that the policy described in the internal controls documentation was not being followed because meeting minutes indicate that there was a change.  The minutes mention that the company continued to collect those accounts.[153]  As Audit Committee chair Ozonian signed the debtors' 2017 Form 10-K, which included the revenue projections based on the collectability of the older accounts receivable.[154]

---

[150] D.I. 213 at 65 of 118 (Audit Committee Charter) (the Audit Committee "is not responsible for … certifying or determining the completeness or accuracy of the Corporation's financial statements or that those financial statements are in accordance with generally accepted accounting principles").

[151] D.I. 225-54 at 6 of 9 (Ozonian Dep.); D.I. 225-10 at 2 of 10; D.I. 225-11 at 2 of 3 (Ozonian approving SOX documentation).

[152] *See, e.g.,* D.I. 213-1 at 95-96 of 120 (March 8, 2017 Audit Committee Meeting Minutes); *id.* at 99-100 of 120 (March 7, 2018 Audit Committee Meeting Minutes).

[153] *Id.* at 99 of 120; D.I. 225-97 (March 7, 2018 Audit Committee Meeting Minutes) ("Balances over 365 days – change to keep those on the books as management continues to collect those.").

[154] D.I. 213-1 at 100 of 120 (approving the 10k 2017 financials after the auditor indicated that its review would be completed the next day and "it is a good draft.").

It is true that Ozonian signed off on the financial reports in question.[155]  But that alone is insufficient to establish a breach of fiduciary duty.[156]  As described above, the defendants who formulated the revenue estimates did not breach their fiduciary duties to the company even though those estimates proved to be incorrect.  As the Court reads *Citigroup*, it does not follow that a director whose role was to review those statements, with the assistance of auditors, would be held to a higher standard.[157]

The trustee also claims that Ozonian is liable under *Caremark* for failing to identify the accounting deficiencies.  The trustee cites two cases to support imposing liability.[158]  In *Marchand*, it was alleged that the board of directors had no system to oversee the food safety of an ice cream manufacturer.  The Delaware Supreme Court ruled to act in good faith the board is only required to "try" to implement a reasonable system of monitoring.[159]  The allegations of the complaint in *Marchand* were sufficient because it was alleged that the directors there lacked any system to oversee a major source of concern for a food manufacturer.[160]  Similarly in *Hughes*, the audit

---

[155] D.I. 225-89 at 34-35 of 84 (report of Audit Committee in Schedule 14A); D.I. 225-85 at 44-45 of 88 (Devor report).

[156] *See Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008) ("The Board's execution of [the company's] financial reports, without more, is insufficient to create an inference that the directors had actual or constructive notice of any illegality."); *Citigroup*, 964 A.2d at 134.

[157] *Citigroup*, 964 A.2d at 134.

[158] *Hughes v. Xiaoming Hu*, No. 2019-0112, 2020 WL 1987029, at *14 (Del. Ch. Apr. 27, 2020); *Marchand v. Barnhill*, 212 A.3d 805 (Del. 2019) (defendant directors knew of listeria contamination risks and disregarded those risks, breaching their fiduciary duties).

[159] *Marchand*, 212 A.3d at 821.

[160] *Id.*

committee was on clear notice of irregularities within the company but only held short meetings when federal law required it and overlooked the pressing issues.[161]  For example, in one 50-minute meeting, the board approved an entire year's worth of related-party transactions, a time period in which the board could not have fulfilled its fiduciary obligations.[162]

The *General Motors* case provides another relevant datapoint.[163]  There, the board exercised some oversight: reviewing the company's risk management structure, risks to the company, and it received presentations on product safety and quality. When GM recalled 28 million vehicles for faulty ignition switches, plaintiffs claimed that board members were liable under *Caremark* because the reporting system did not adequately assess the personal injury risks.[164]  That was not enough for liability. The board had "tried" to implement a system of oversight and its inadequacy alone was not ground for *Caremark* liability.

The import of this caselaw is that a director must attempt to implement a reporting system for known risks to a company, then must attempt to provide oversight—success is not required.  The record shows that Ozonian performed an active role on the Audit Committee until he experienced health complications just before the bankruptcy filing.  While there were concerns about growing receivables,

---

[161] *Hughes*, at *14.

[162] *Id.* at *15.

[163] *In re General Motors Co. Derivative Litig.*, No. 9627, 2015 WL 3958724 (Del. Ch. June 26, 2015).

[164] *Id.* at *15.

there is no indication that he ignored them nor that he held perfunctory meetings. While Ozonian and the Audit Committee could have fully excavated the source of the debtors' financial problems, they were only required to "try" to implement a system of oversight to avoid breaching their fiduciary duties. The record before the Court indicates that the committee sought to monitor the company, receiving presentations from management and auditors. Under applicable caselaw, that is sufficient to satisfy their fiduciary duties.

## II. Alternatively, the record would not support a finding that any of the alleged breaches caused the company harm.

A plaintiff must prove not only that a breach of fiduciary duty occurred, but that there is a connection between the breach and harm that befalls the company.[165] The damages for a breach of fiduciary duty must be "logically and reasonably related to the harm or injury [for] which compensation is being awarded."[166] Where the plaintiff does not point to sufficient evidence to draw a causal link between harm to the debtors and the alleged breach, or where the court lacks a reasonable basis to estimate damages based on the record, summary judgment must be granted.

The plaintiff argues that these alleged breaches of fiduciary duty caused the eventual chapter 7 bankruptcy of the debtors.[167] His expert, Harris Devor, cited other

---

[165] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 859 (Del. Ch. 2022) ("Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages.") (internal quotation and citation omitted).

[166] *Id.* ("A plaintiff also must prove by a preponderance of the evidence that a sufficient causal linkage exists between the breach of duty and the remedy sought to make the remedy an apt means of addressing the breach.").

[167] D.I. 224 at 46-47.

examples of material misstatements leading to the downfall of well-known companies to justify his conclusions:

> Inventors, creditors, and other users of the financial statements ("stakeholders") need to have confidence in the propriety of financial statements. These stakeholders are intent on dealing with companies that uphold values of integrity, transparency and honesty… The necessity of restating financial statements either as a result of unintentional error or due to the nefarious activities of management… has led to the collapse of many companies including some noteworthy ones…, e.g., Enron, WorldCom, Sunbeam, Lehman Brothers, to just mention a few. The inevitable litigation that follows cases of fraud or the uncovering of unreliable internal control systems, among others, can cause irreparable damage to a company's image and brand.[168]

The expert then connected Nobilis' failure to submit necessary filings in late 2018 with its significant stock price drop and delisting from the New York Stock Exchange.[169]

The trustee fails to provide evidence that would permit a reasonable factfinder to connect the accounting errors to the company's failure. For example, the trustee's brief argues that Nobilis was already experiencing financial difficulties before Hurricane Harvey and before the changes in practice dealing with writing off old receivables in the third quarter of 2017.[170] Indeed, the trustee acknowledges that the debtors were facing financial challenges that led it to adopt the change in policy. Devor's calculated damages was the entire difference in the enterprise value from

---

[168] D.I. 225-85 at 59-60 of 88.

[169] *Id.* at 60 of 88.

[170] D.I. 224 at 48 ("The August 2017 Report was issued before Hurricane Harvey hit and painted a bleak picture of Nobilis's financial performance—with estimate revenues" far below budget.); D.I. 225-25 (August 2017 Report).

June 30, 2017 to its bankruptcy less liquidation proceeds.[171]   The report, however, offers little more than the conclusory assertion that "the accounting improprieties. . . caused the Company's demise."[172]

    As the plaintiff's only evidence for causation, the expert report falls short.   The report relies upon conclusory allegations regarding financial misstatements and does not provide a reason why the alleged breaches of fiduciary duty, rather than the underlying economic challenges the company faced, were responsible for the company's total loss in market value.   As the Third Circuit instructed, "the nonmoving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact."[173]   The plaintiff has failed to come forward with sufficient evidence to permit a reasonable finder of fact to conclude that it has met its burden on this issue.

    The record in this case makes clear that as insurers began to refuse to pay for certain out-of-network procedures, the debtors found itself collecting less than it had anticipated while the unpaid receivables that were on its books began to age.   When it was first presented with this problem, it was not clear to the debtors whether the issue was that the insurers would *never* pay for these procedures, or whether the issue was that they needed to enhance their collection efforts, in which case the problem would simply be one of timing.

---

[171] D.I. 225-85 at 61-62 of 88.

[172] D.I. 225-88 at 14 of 17.

[173] *Pastore v. Bell Telephone Co. of Pa.*, 24 F.3d 508, 511 (3d Cir. 1994).

In the fall of 2017, the debtors altered their accounting practices on the premise that the collections issue would prove to be a temporary one.  That judgment, however, turned out to be incorrect.  The issue was not one of timing, and the suggestion that these old receivables would ultimately be paid proved to be unduly optimistic.  Rather, the insurers were not going to pay at all for certain of the services.

Against that backdrop, blaming the failure of the business on the erroneous accounting judgments badly loses the forest for trees.  The accounting issue arose only because the company's cash collections were falling short.  And when a company is not getting paid for the services it performs, even the most immaculate accounting will not yield a successful business enterprise.  Devor's overly general and conclusory assertions about causation—which is the only evidence on which the trustee relies to establish this element—ultimately amounts to little more than camouflage.  To the extent the defendants' accounting judgments turned out to be incorrect, their efforts proved to be a band aid that failed to stop the bleeding.  No reasonable factfinder, however, could find that an inadequate band aid was the cause of the patient's injury.  Accordingly, even if one or more of the defendants had breached his fiduciary duties, defendants would still be entitled to summary judgment on account of the plaintiff's failure to demonstrate causation.

## III.   The equitable subordination claim is dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

The equitable subordination claim is at the motion to dismiss stage. The trustee alleges that the inequitable conduct at issue in the adversary proceeding filed

in 2021 requires the equitable subordination of the claims BBVA transferred to certain defendants as part of their settlement agreement.

The trustee agreed that there is a basis for equitable subordination only if he succeeds on the breach of fiduciary duty claims.[174]  Since this Court found that the fiduciary duty claims fail, the complaint accordingly fails to state a claim for which relief may be granted and must therefore be dismissed.

In addition, the Court notes that in the alternative, even if the claims for breach of fiduciary duty had survived a motion for summary judgment, it would still be far from clear that the claims that defendants acquired from BBVA would be subject to equitable subordination.  There is a robust secondary market in claims against debtors in bankruptcy.  At times, defendants in lawsuits that are being pursued on behalf of the bankruptcy estate will acquire claims against the debtor as a means of hedging their own liability.  It is far from obvious that there is anything inequitable about that strategy. The holders of those claims, after all, are willing sellers who would rather accept the cash being offered by the buyer than continue to hold the claim and take their chances on what their ultimate distribution will be.  The equitable subordination complaint makes no allegation, other than its claim about the defendants' underlying liability, that defendants did anything inequitable in connection with their acquisition of the claims.  The Court accordingly concludes that the claim for equitable subordination would be subject to dismissal even if the underlying claims were to have survived the motions for summary judgment.

---

[174] Dec. 13, 2023 Hr'g Tr. at 145-146.

**Conclusion**

For the reasons stated above, the Court will recommend the entry of summary judgment in favor of defendants Efird, Rodriguez, and Ozonian.  The Court will also enter summary judgment in favor of defendants Fleming, Young, and Moreno.  Finally, the Court will dismiss the equitable subordination complaint brought against defendants Fleming, Young, and Moreno.  The Court will accordingly issue separate orders and judgments so providing.

Dated: June 12, 2024

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE